Filed 3/19/14  In re A.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | C074584 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>M.S.,<br><br>        Defendant and Appellant. | (Super. Ct. No. JD232706) |

M.S. (mother) appeals following the juvenile court's order terminating parental rights as to minor A.R.  (Welf. & Inst. Code, § 366.26.)[1]  Mother contends the court erred by denying her petition to modify court orders (§ 388), and that notice given under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.; hereafter ICWA) was inadequate. We shall affirm.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

# FACTUAL AND PROCEDURAL BACKGROUND

In September 2012, Sacramento County Department of Health and Human Services (Department) filed a section 300 petition as to the newborn minor, alleging that mother and the minor tested positive for methamphetamine; mother was a longtime methamphetamine addict; she had a history of domestic violence with the alleged father, D.R., who was also a substance abuser; and she had lost custody and parental rights as to four older children due to substance abuse. Mother claimed her grandparents had Apache, Blackfeet, and Cherokee heritage.

According to the detention report, mother admitted a history of bipolar disorder and posttraumatic stress disorder but claimed she had stopped taking medications due to her pregnancy. The detention report also stated mother claimed Blackfeet, Apache, and Cherokee ancestry.

On her ICWA-020 form (020 form), dated September 25, 2012, mother claimed Indian ancestry in the Blackfeet, Cherokee, Cheyenne, and Sioux tribes. In a declaration dated October 9, 2012, the ICWA paralegal stated:

"[A]t the Initial Hearing on September 25, 2012[,] [mother] claimed Blackfoot [*sic*], Cherokee and Cheyenne heritage . . . . [Mother] also claimed Apache heritage as reported in the child's Detention Report.

"ICWA noticing was done for siblings of the above-named child in 2007 and 2011 for [mother]'s claim of Native American ancestry as well as the children's father's claim of Native American ancestry. No tribe responded that the siblings were eligible for membership or enrollment.

"The undersigned spoke with [mother] on October 1, 2012 regarding new family or tribal information she might have. [Mother] told the undersigned that she's only claiming Cherokee and Blackfoot [*sic*] ancestry, no Cheyenne. She did not claim Apache

ancestry.[2]  She confirmed the previous information that was provided for the siblings . . . ."

After recounting unsuccessful attempts to obtain further information from the maternal great-grandmother and the maternal aunt, the ICWA paralegal attached the ICWA-030 notice (030 notice) sent to the Blackfeet and Cherokee tribes.

As of December 10, 2012, all noticed tribes had returned negative responses.

On December 19, 2012, the juvenile court exercised jurisdiction over the minor and ordered her continued placement outside mother's custody, in a foster home where one of the minor's siblings was also placed.

On January 16, 2013, after the contested dispositional hearing, the juvenile court denied reunification services to mother pursuant to section 361.5, subdivision (b)(10), (11), and (13), and set the matter for a section 366.26 hearing, although the court found mother had made "good" progress toward alleviating or mitigating the causes necessitating placement.[3]

In April 2013, the section 366.26 report recommended adoption by the minor's current caregivers and the termination of parental rights.  The report noted that mother had "done some rehabilitation[,]" but deemed her "changing circumstance . . . insufficient to warrant services."  Mother had visited consistently, but was not the primary caregiver. The minor was generally adoptable and was placed in a home that was eager to adopt her, as it had previously adopted her sister.

---

[2]  The declaration was silent as to mother's 020 form claim of Sioux ancestry, which mother apparently did not make orally at the initial hearing.

[3]  The court denied reunification services to the biological father pursuant to section 361.5, subdivision (a), and thereafter terminated his parental rights along with those of mother.  He is not a party to this appeal.

3

The report stated that the alleged father, who had claimed Apache and Cherokee ancestry in prior cases involving the minor's siblings, had just been determined to be the biological father. Even though the tribes did not confirm tribal heritage in the prior cases, ICWA noticing as to father had begun.

Shortly afterward, mother filed a section 388 petition requesting reunification services with the goal of returning the minor to mother's custody. Mother alleged and documented that she had completed residential and transitional drug treatment and other programs, was on step eight of her 12-step program, and was employed as an in-home caregiver; moreover, she alleged, she visited the minor twice a month and enjoyed the visits, and no concerns had been noted.

In response, the Department asserted that it was not in the minor's best interest to provide reunification services for mother. Mother had shown changing circumstances, but had not shown she could stay sober outside a controlled environment; she had had short-term success with services in the past, but had not been able to maintain those results. Aside from substance abuse, she had not addressed her risk factors, including her mental health history; on the contrary, she denied any past or current medical concerns, rejected her prior diagnoses, and refused to take any medications prescribed for her conditions.[4] Finally, mother had not formed a bond with the minor and showed poor parenting skills during visits.

On August 15, 2013, the juvenile court held a hearing on the section 388 petition. Mother testified as follows:

After losing custody of the minor, mother successfully completed three months of residential substance abuse treatment at Gateway on January 19, 2013. She then stayed at Unity, a transitional program, for four and one-half months. While at Unity, she enrolled

---

[4] When asked about her bipolar diagnosis, she said: " 'Everyone's bipolar.' "

4

in outpatient treatment at Mercy Perinatal Network (Mercy). On May 15, 2013, she had enrolled at Mather, where she could stay for up to a year.

During her stay at Unity, she took 12 weeks of parenting classes, did 10 group domestic violence counseling sessions, engaged in one-on-one counseling for 12 or 13 weeks, and participated in substance abuse services and 12-step groups at Mercy. She was randomly drug tested once or twice a week. She had a sponsor and had now completed the 12-step program.

At Mather, mother took job preparation classes, did community service hours, and continued her 12-step meetings. She was preparing to apply for permanent housing. She currently worked 44 hours a week (Saturday to Monday) as an in-home care provider, but was looking for an additional job because her client was 94 years old.

Mother had two hours a month of supervised visitation with the minor. She had attended regularly. The visits were "sometimes very emotional" because she was "overwhelmed" with "trying to create a bond." She felt sometimes as if the minor did not know who she was. Sometimes the visits would be over by the time the minor settled down. But at other times they went well, with mother playing with and singing to the minor.

Mother's three oldest children were placed with mother's aunt and grandmother in Atlanta. Mother spoke to them by telephone once a week.

Mother was on close terms with the foster mother. She believed the foster mother wanted whatever was in the minor's best interests.

Mother's "clean date" was September 29, 2012, two weeks after the minor's birth. Her current period of sobriety (almost one year) was her longest. Her drugs of choice were methamphetamine, marijuana, alcohol, and Ecstasy.

Mother had been through treatment programs, parenting classes, individual counseling, and domestic violence programs before, but this time she had a better attitude; it was the first time she had done the programs of her own free will and without

5

blaming others for her problems. It would be in the minor's best interests to provide mother with reunification services because she was finally ready to provide for the minor's needs: she had her own place to live, she was working, she was in a safe environment, she had a support group, and she could take responsibility for the minor.

After hearing extended argument, the juvenile court took the matter under submission. The next day, the court denied mother's petition, reasoning as follows:

Mother had "decidedly" shown a change of circumstances or new evidence. But she had not shown that giving her services would be in the minor's best interest. The minor was on the brink of adoption, living in a home that was ready to adopt her. On the other hand, it was doubtful whether mother could complete a case plan in six months because she had not addressed her mental health problems and did not have a strong bond with the minor. The fact that mother had once before achieved eight months of sobriety and then "fell off task" was also troubling. In any event, to take the minor off her present course toward permanency would amount to "stopping now and going backwards."

The juvenile court then addressed ICWA compliance. The court found that all noticed tribes had responded in the negative except for two, which had not responded within the 60-day statutory deadline. Thus, ICWA had been complied with and there was no basis for finding that the minor was an Indian child.

Lastly, the juvenile court ruled under section 366.26, that clear and convincing evidence showed the minor was adoptable and no exception to adoption applied. Therefore, the court terminated parental rights and ordered adoption as the permanent plan.

## DISCUSSION

### I

Mother contends the juvenile court abused its discretion by denying mother's section 388 petition. We disagree.

6

A petition to modify a juvenile court order under section 388 must factually allege changed circumstances or new evidence, and that the proposed modification will serve the minor's best interests. (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.) The petitioner has the burden of proof on both points by a preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1)(C).) In assessing the petition, the court may consider the entire history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

To decide whether a parent has met their burden, the juvenile court must consider such factors as the seriousness of the problem that led to the dependency, and the reasons for the problem's continuation; the degree to which the problem may be and has been removed or ameliorated; and the strength of the relative bonds between the dependent child and the child's parents or caretakers. This list is not exhaustive, however. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1229 (*B.D.*); *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*).)

When a parent brings a section 388 petition after a section 366.26 hearing has been set, the best interests of the minor are of paramount importance. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) Therefore, the juvenile court looks not to the parent's interest in reunification but to the minor's need for permanence and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).)

We review a ruling denying a section 388 petition for abuse of discretion. (*In re S.R.* (2009) 173 Cal.App.4th 864, 866.) We reverse only if the ruling exceeded the scope of the juvenile court's discretion, or if under all of the evidence, viewed most favorably to the ruling, no reasonable judge could have made that ruling. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351; see *Great West Contractors, Inc. v. Irvine Unified School Dist.* (2010) 187 Cal.App.4th 1425, 1459.)

Here, it is undisputed that mother established changed circumstances. But she did not establish that granting her reunification services, at a time when the minor was on

course to adoption, would be in the minor's best interest. As the juvenile court found, such an order would have run counter to the minor's need for permanence and stability. (*Marilyn H., supra*, 5 Cal.4th at p. 309.) And as the court also found, other relevant factors weighed against granting services to mother.

Because mother rejected her mental health diagnoses and refused her prescribed medications without any apparent justification, she failed to show that all of the problems leading to the dependency (and to the termination of reunification services and parental rights as to four older children) had been or could be ameliorated. (*B.D., supra*, 159 Cal.App.4th at p. 1229; *Kimberly F., supra*, 56 Cal.App.4th at p. 532.) There was also reason to doubt the permanence of her recovery from substance abuse, since it had lasted less than a year under controlled conditions, after repeated relapses which followed short-term successes. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423.) Finally, for whatever reasons, the bond between mother and the minor was far weaker than that between the minor and the foster parents, with whom the minor had lived her entire life. (*B.D., supra*, 159 Cal.App.4th at p. 1229; *Kimberly F., supra*, 56 Cal.App.4th at p. 532.) On all these grounds, the juvenile court properly exercised its discretion to favor the minor's interest in permanence and stability over mother's desire to reunify with a child who had not been in her custody since birth. (*Stephanie M., supra*, 7 Cal.4th at p. 317; *Marilyn H., supra*, 5 Cal.4th at p. 309.)

## II

Mother contends the ICWA notice given was inadequate because (1) the Sioux tribe, named on mother's 020 form, did not receive notice, and (2) the notice given to the Apache and Cherokee tribes as to father's alleged Indian ancestry was defective. We find no prejudicial error.

When the juvenile court knows or has reason to know that a child involved in a dependency proceeding is an Indian child, ICWA requires that notice of the proceedings be given to any federally recognized Indian tribe of which the child might be a member

8

or eligible for membership.  (25 U.S.C. §§ 1903(8), 1912(a); *In re Robert A.* (2007) 147 Cal.App.4th 982, 989 (*Robert A.*).)  Notice requirements are construed strictly.  (*Robert A., supra*, 147 Cal.App.4th at p. 989.)  Where notice has been given, any error in notice is subject to harmless error review.  (*Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 784.)

Section 224.3, subdivision (a), imposes "an affirmative and continuing duty to inquire" whether a child is or may be an Indian child.  Notice must include all of the following information, if known:  the child's name, birthplace, and birth date; the name of the tribe in which the child is enrolled or may be eligible for membership; names and addresses (including former addresses) of the child's parents, grandparents, and great-grandparents, and other identifying information; and a copy of the dependency petition.  (25 C.F.R. § 23.11(d)(1)-(4) (2004); § 224.2, subd. (a)(5)(A)-(D); *In re D.W.* (2011) 193 Cal.App.4th 413, 417; *In re Mary G.* (2007) 151 Cal.App.4th 184, 209.)

A non-Indian parent may raise an ICWA claim on behalf of the other biological parent.  (See *In re Jonathon S.* (2005) 129 Cal.App.4th 334, 339-340; *In re Riva M.* (1991) 235 Cal.App.3d 403, 411, fn. 6.)

**Notice as to Mother**

Mother's 020 form, filled out on September 25, 2012 (the date of the initial hearing), claimed ancestry in the Blackfeet, Cherokee, Cheyenne, and Sioux tribes.[5]  The minute order of the initial hearing does not state which tribes, if any, mother orally mentioned there.

---

[5]  The previously filed detention report stated that mother claimed Blackfeet, Cherokee, and Apache ancestry, but not Sioux or Cheyenne ancestry.  The ICWA paralegal's first declaration notes the Apache claim, but states that mother was no longer raising that claim.  No further mention of mother's alleged Apache ancestry appears in the record, and mother does not contend that the Apache tribes should have received ICWA notice as to her.

Mother asserts that the failure to give notice to the Sioux tribes was prejudicial error.[6] We disagree.

On October 9, 2012, the ICWA paralegal declared: "[Mother] claimed Blackfoot [*sic*], Cherokee and Cheyenne heritage at the [initial] hearing. [Mother] also claimed Apache heritage as reported in the child's Detention Report. [¶] . . . [¶] . . . [Mother] told the undersigned that she's *only* claiming Cherokee and Blackfoot [*sic*] ancestry, no Cheyenne. She did not claim Apache ancestry." (Italics added.) This wording shows that, whatever tribes may have been mentioned in the detention report, at the initial hearing, or on mother's 020 form, she now excluded all tribes other than Cherokee and Blackfeet from her claim of Indian ancestry. Notice to other tribes was therefore unnecessary.

**Notice as to Father**

Mother asserts that the notice given as to father was defective in two respects: (1) some ancestors' names appeared in different versions on the 020 form and 030 notice; and (2) some names shown on the 020 form did not appear at all on the 030 notice. We conclude any error was harmless.

*Background*

On April 25, 2013, father executed a 020 form claiming possible Apache and Cherokee ancestry. The form named two alleged Cherokee ancestors: "[paternal great-grandmother]" Josephine Parish and "[paternal grandmother]" Helen R.[7]

---

[6] On the first point, mother initially contended that the Cheyenne tribe, also named on her 020 form, should also have received notice. After respondent pointed out that mother expressly abandoned her claim of Cheyenne heritage before the first ICWA notice was sent, mother withdrew this contention in her reply brief.

[7] Helen R.'s last name is the same as father's.

On May 5, 2013, the ICWA paralegal gave notice to the Apache and Cherokee tribes. The paralegal declared: "The undersigned was able to obtain information previously provided by [father] and his family regarding his Native American ancestry from the sibling's [*sic*] case (Court No.'s 225486, 225487). The undersigned sent e-mails to [father] at the Sacramento County Main Jail on April 18 and April 30, 2013 requesting any updated information regarding his Native American ancestry. [Father] called the undersigned from [j]ail on May 2, 2013 and confirmed Cherokee and Apache ancestry. He indicated his family's Indian ancestry has never been confirmed. He said no one in the family receives any money because of their Indian ancestry. [Father] does not claim enrollment or membership with a tribe. He confirmed the information previously provided for the siblings."

The 030 notice sent to the tribes gave father's birth date, birthplace, and current address; the names, birth dates, and birthplaces of paternal grandparents D.R., Sr., said to be Apache, and Karen Lynn King R., said to be Cherokee (current addresses stated only as "Sacramento, CA"); and the names, birth dates, birthplaces, and dates and places of death of paternal great-grandmothers Josephine Louise Hinds, said to be Cherokee, and Helen Dorothy Cooper, said to be Apache.[8]

On May 31, 2013, the ICWA paralegal declared that the United Keetoowah Band of Cherokee Indians, the Mescalero Apache Tribe, the San Carlos Apache Tribe, and the Tonto Apache Tribe had returned negative responses, while the other noticed tribes (including the Blackfeet Tribe of Montana, even though father never claimed Blackfeet ancestry) had not yet responded.

On July 8, 2013, the ICWA paralegal declared that the Cherokee Nation of Oklahoma, the Eastern Band of Cherokee Indians, and the Apache Tribe of Oklahoma

---

[8] The paternal great-grandfathers' names were also given, but all other boxes as to them were marked "Does not apply."

11

had now returned negative responses, while the Blackfeet Tribe of Montana, the Fort Sill Apache, the Jicarilla Apache Nation, the White Mountain Apache, and the Yavapai-Apache Nation had still not responded.

On August 9, 2013, the ICWA paralegal declared that the White Mountain Apache and the Yavapai-Apache Nation had now returned negative responses, while the other remaining tribes had still not responded.

On August 16, 2013, the juvenile court found that ICWA had been complied with and the minor was not an Indian child.

*Analysis*

Mother asserts that "no explanation appears in the record for the discrepancy in names between the ICWA-020 and ICWA-030 forms and the failure to include the names Josephine Parish and Helen R[.] in the ICWA-030." Although literally true, this point is less telling than mother argues.

The tribes noticed in this case previously received notice in the siblings' cases and could not find any of the paternal ancestors' names -- previously provided by father and his family and confirmed once more by father in this case -- in their membership rolls. The record does not show that father gave any new or different information to the ICWA paralegal in this case, despite her repeated request for "any updated information." The first names given for the great-grandmothers are the same on the 020 form and the 030 notice; only the last names differ. The version of one great-grandmother's name given on the 020 form includes a last name that is the same as father's last name, while the version of her name given on the 030 notice includes a different last name. Thus, it is reasonable to infer that the great-grandmothers' names as given in the 020 form are simply alternative versions of those given in the 030 notice, using their married names rather than their maiden names.

A search based on birth dates and birthplaces would be more likely to locate maiden names (the great-grandmothers' birth names) than married names. Furthermore,

12

the great-grandmothers' other information (dates and places of death) was also given with reasonable specificity ("6/12/1993, Sacramento, CA" as to Josephine Louise Hinds; "2000 or 2002, Sacramento County, CA" as to Helen Dorothy Cooper). Thus, it appears that the tribes had enough information to locate the great-grandmothers in the tribal records if they were to be found there. Any error in failing to include both versions of the great-grandmothers' names on the 030 notice is therefore harmless.

Mother relies on *In re Louis S.* (2004) 117 Cal.App.4th 622 (*Louis S.*) to support her claim of prejudice. *Louis S.* is distinguishable. First, the mistakes, discrepancies, and outright omissions of required and apparently available information were far more egregious than here. (*Id.* at p. 631 [misspelled and incomplete names, missing birth dates, key information in wrong part of form].) Furthermore, these mistakes occurred on forms that were never filed with the juvenile court, but were sent only to the Bureau of Indian Affairs. (*Ibid.*) *Louis S.* therefore, does not assist mother.

## DISPOSITION

The order terminating parental rights is affirmed.


    BLEASE    , Acting P. J.


We concur:


    MURRAY    , J.


    DUARTE    , J.


13